**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRIGHTVIEW LANDSCAPES, LLC | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MICHAEL IATZKO, | : |
| | : |
| Defendant. | : |

**VERIFIED COMPLAINT**

Plaintiff BrightView Landscapes, LLC ("BrightView"), by and through its undersigned counsel, and for and in support of its Complaint against Defendant Michael Iatzko ("Iatzko"), hereby avers as follows:

## I. Introduction

1. BrightView is one of the nation's leading commercial landscape companies. It provides a wide array of landscaping and maintenance services, including, but not limited to, landscaping design; landscaping maintenance; snow and ice removal; water and irrigation services; and tree care. Its customers include corporate campuses, sports stadiums, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

2. Michael Iatzko was a Business Development Executive who worked for BrightView in a territory located in southeastern Michigan and northwestern Ohio. In his customer-facing role, Iatzko worked to bring new business to BrightView, whether by engaging new customers or by expanding the work that BrightView did for existing customers.

3. Iatzko's role within the company made him privy to wide range of confidential information that BrightView uses to succeed in the highly competitive commercial landscaping industry.

4. The confidential information that Iatzko knows includes, but is not limited to, the identities of the precise individuals at BrightView's customers who make purchasing and contracting decisions; the annual spend of its customers; service issues, if any, that such customers may be encountering; BrightView's labor costs; BrightView's project estimator model; BrightView's pricing; discounts, rebates, and pricing that BrightView receives from vendors; and BrightView's target profit margins.

5. By the time of Iatzko's voluntary resignation, BrightView estimates that he possessed confidential information about 80-90% of the customers in the territory to which he was assigned, representing millions of dollars annually in revenues.

6. Upon being promoted to Business Development Executive, Iatzko signed BrightView's Confidentiality, Noncompetition, and Nonsolicitation Agreement, effective as of November 1, 2023 ("Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

7. Iatzko's Agreement with BrightView contains several restrictive covenants to protect BrightView's legitimate interests. Among them, the Agreement provides that, for one year following the termination of his employment with BrightView, Iatzko may not be employed by or participate in any manner with a "Competing Business" in his "Restricted Territory" where doing so will require Iatzko "to provide the same or substantially similar services" as Iatzko provided for BrightView or that would otherwise "result in the use or disclosure of Confidential Information." *See* Agreement at § 5.

8. On January 13, 2025, Iatzko voluntarily resigned from BrightView. During his exit interview, Iatzko stated that he was going to work for Continuum Services ("Continuum") in a business development capacity. Continuum also provides commercial landscaping and maintenance services, and it is a direct competitor of BrightView and "Competing Business" within the meaning of the Agreement.

9. Continuum has assigned Iatzko to work in the metro Detroit area.

10. The metro Detroit area falls squarely within Iatzko's Restricted Territory as defined by the Agreement. In a recent affidavit, Iatzko himself affirmed that he "covered certain geographical areas [while representing BrightView] in the metropolitan area of Detroit, Michigan." *See* Affidavit of Michael Iatzko at ⁋ 4 (a true and correct copy of which is attached hereto as Exhibit B) ("Iatzko Affidavit").

11. Despite repeated demands for compliance with the restrictive covenants set forth in the Agreement, Iatzko continues work for Continuum in a manner and in a location that puts him in breach of contract.

12. Iatzko's breach of contract threatens BrightView with irreparable injuries relating to the loss of its goodwill and the misuse and disclosure of BrightView's confidential information.

13. BrightView therefore brings this action to enforce its rights and to protect its goodwill and confidential information.

## II. The Parties

14. BrightView is a limited liability company organized under the laws of the State of Delaware. BrightView's principal place of business is located at 980 Jolly Road, Blue Bell, Pennsylvania 19422.

15. Iatzko is an individual who is a citizen of the State of Michigan residing at 11187 Armstrong Road, South Rockwood, Michigan 48179.

## III. Jurisdiction and Venue

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. Attached hereto as Exhibit A is a true and correct copy of the Agreement executed by Iatzko that is the subject of this action.

18. The Agreement provides that any "any and all actions or proceedings by BrightView to enforce this Agreement may be brought in the State and/or Federal Courts located in or serving Blue Bell, Pennsylvania" and that such courts "shall have in personam jurisdiction . . . for the purpose of litigating any dispute, controversy, or proceeding arising out of or relating to this Agreement." *See* Agreement at § 12.

19. Venue is proper in this district pursuant to 28 U.S.C §§ 1391(b)(2) and (b)(3) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and because the defendant is subject to the court's personal jurisdiction.

20. With respect to venue, the Agreement provides "[e]ach party waives any right it may have to assert the doctrine of forum non conveniens . . . or to object to venue" and "stipulates that the State and Federal courts located in or serving Blue Bell, Pennsylvania shall have . . . venue . . . for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement." *See* Agreement at § 12.

## III. Factual Background

### A. BrightView's Business.

21. BrightView is a landscaping business that traces its roots back to 1939. It was originally founded by Theodore Brickman, Sr., who started a landscape company called "Brickman Group, Ltd." Over the decades that have passed since, the company continued to add services until 2014, when it merged with ValleyCrest Landscape Companies. The combined companies became known as BrightView, and today, BrightView provides landscaping and maintenance services throughout the United States.

22. BrightView helps its customers design landscapes that are both beautiful and functional. Once designed, BrightView develops and implements the projects to turn the designs into reality.

23. BrightView also maintains its customers' landscapes, and its maintenance services are extensive. They include fertilization, lawn care, tree care, weed and pest management, storm preparedness, water and irrigation management, and snow and ice removal services.

24. BrightView serves many different markets. Its customers include corporate campuses, sports stadiums, retail shopping centers, places of worship, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

25. In short, BrightView is national business providing extensive landscaping and maintenance services to customers engaged in a diverse array of businesses.

### B. Iatzko's Employment with BrightView.

26. Iatzko began his career with BrightView in 2018, when he was hired as an Account Manager working out of a branch office located in Canton, Michigan.

27. As an Account Manager, Iatzko was the "face" of BrightView with its customers.

28. In the role of Account Manager, Iatzko was responsible for client satisfaction. He was expected to develop and maintain long-term relationships with clients, to perform site walkthroughs to ensure that quality and service expectations were being met, and to facilitate the resolution of client concerns to ensure renewal.

29. Iatzko's job as an Account Manager also entailed proactively presenting business enhancement ideas to his clients, generating referrals from existing clients to pass along to BrightView's Business Developers, and to help prepare accurate estimates for clients that also ensured profitable results for BrightView.

30. To help him do his job, BrightView gave Iatzko extensive training to become an effective salesperson, including courses on developing proposals, handling objections, disqualifying prospects, and closing sales.

31. Iatzko excelled as an Account Manager, leading BrightView to promote him to the positions of Business Developer, and eventually, Business Developer Executive (collectively, "Business Developer").

32. As a Business Developer, Iatzko was responsible to improve BrightView's market position and to help it achieve profitable financial growth. Iatzko was also expected to help BrightView achieve long-term organizational and strategic goals, build key customer relationships, identify business opportunities, negotiate, and close business deals.

33. Iatzko's job further entailed managing the sales pipeline from prospecting to closing. He collaborated and worked with colleagues at BrightView from many different departments, including operations, finance, marketing, and other Business Developers to manage responses to bids to meet sales targets.

34. In working as a Business Developer, Iatzko had to work with prospective customers to discover their needs and develop solutions. Doing so required Iatzko to be involved in estimating costs for potential projects, developing pricing and bids, and handling contract negotiations.

35. To enable Iatzko to perform these duties, BrightView supplied and gave him access to a tremendous amount of confidential information.

36. While working as a Business Developer, Iatzko had access to BrightView's Customer Relationship Management database ("CRM"). By using the CRM, Iatzko learned many types of client-specific data, including (a) the identities of the precise individuals at customer businesses who made purchasing and contracting decisions (such as a property/facility manger or chief engineer who cannot be easily identified through public sources without much time and effort); (b) the services that customers utilized; (c) their estimated annual spend; and (d) whether they were happy, unhappy, or had any service-related issues.

37. BrightView also shared other highly sensitive information with Iatzko, including its gross margin percentages; material and subcontractor markup percentages; the national rebates that BrightView receives from certain vendors; the identities of subcontractors who offer BrightView specialized pricing and the terms of such pricing; the identities of vendors who supply bulk and bagged salt and the prices they charge BrightView (a key factor for pricing snow removal services); BrightView's composite labor rates in southeastern Michigan; and the identities of customer prospects that BrightView is targeting.

38. Iatzko was also intimately familiar with BrightView's proprietary method of estimating costs and setting pricing for customer projects or maintenance contracts, and he knew BrightView's target profit margins for customer bids.

39. The branch in which Iatzko worked routinely held branch meetings that Iatzko attended. During these meetings, the attendees shared information about business opportunities and customer issues, and Iatzko used that information to help him with his business development responsibilities for BrightView.

40. Many of BrightView's customers operated out of several locations, and as a Business Developer Executive, Iatzko worked on larger, more strategic deals that required Iatzko to coordinate, collaborate and share confidential information with other Business Developers throughout southeastern Michigan. Consequently, Iatzko worked jointly with other Business Developers to pursue opportunities throughout the region, and he thereby became exposed to and learned an extensive amount of confidential information about those customers and BrightView's business with them.

41. Given his responsibilities as a Business Developer, during the last two years of his employment with BrightView, Iatzko worked, represented BrightView, and material contact with BrightView customers in a geography that included all points in Michigan south of Interstate 69 ("I-69") and east of US Route 127 ("US 127"). It also extended into northwestern Ohio to include the metro-Toledo area. The following is an excerpt from a map that visually depicts the geographic scope of Iatzko's assigned territory:




**C. Iatzko's Agreement with BrightView.**

42. Given the extensive goodwill with customers of and customer prospects for BrightView with which Iatzko was entrusted – along with the tremendous amount and significant sensitivity of confidential and proprietary business information that was shared with Iatzko and to which he was given access – BrightView required him to execute the Agreement that is the subject of this action.

43. Although he had signed a similar agreement upon being hired by BrightView in 2018, BrightView again required Iatzko to execute the Agreement as a condition of his promotion to Business Developer Executive in 2023.

44. In Section 3 of the Agreement, Iatzko agreed that he would not use or disclose BrightView's "Confidential Information" except on behalf of BrightView and in furtherance of its business:

> **<u>Non-Disclosure and Non-Use of Confidential Information and Trade Secrets</u>.** During the term of team member's employment and following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, except as authorized and required to perform team member's duties for BrightView, directly or Indirectly: use, disclose, reproduce, distribute, or otherwise disseminate BrightView's Confidential Information and Trade Secrets, or take any action causing or failing to prevent any such information to lose its character or cease to qualify as Confidential Information or a Trade Secret. . . This prohibition applies regardless of whether the Confidential Information or Trade Secret was acquired before the effective date of this Agreement or thereafter.

*See* Agreement at § 3.

45. The Agreement defines the term "Confidential Information" in pertinent part as follows:

> **"Confidential Information"** means (i) competitively sensitive information, (ii) of importance to BrightView, and (iii) that becomes known to team member through his or her employment with BrightView. Confidential Information includes Trade Secrets, but an item of Confidential Information need not rise to the level of Trade Secret in order to be protected from disclosure by this Agreement. Confidential Information includes, but is not limited to, information about: BrightView's operations, services, and research and development of BrightView's operations or services; names and other listings of current or prospective Customers, proposal to any current or prospective Customers, the terms of any arrangements or agreement with any Customers, including payment and pricing information, and the implementation of Customer-specific projects; the composition or description of future services that will or may be offered by BrightView; marketing strategies; financial and sales information; and the technical expertise and know-how developed by BrightView, including the unique manner in which BrightView conducts its business. Confidential Information also includes information disclosed to BrightView by any third party (including, but not limited to, current or prospective Customers) that BrightView is required to treat as confidential.

*See* Agreement at § 1(c).

46. In Section 5 of the Agreement, Iatzko agreed that he would not compete with BrightView for a period of time in a limited geography upon the termination of his employment with BrightView:

> **Non-Competition.** Team member agrees that during team member's employment and for a period of one (1) year following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require team member to provide the same or substantially similar services to a Competing Business as those that team member provided to BrightView during the Look Back Period o[r] such other services that would result in the use or disclosure of Confidential Information. The foregoing is also limited to providing services in the area(s) of BrightView's business as to which team member had material business related involvement or received Confidential Information during the Look Back Period.

*See* Agreement at § 5.

47. The Agreement defines a "Competing Business" as "any individual (including team member), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, any part of the Business of BrightView, or that is taking material steps to engage in such Business." *See* Agreement at § 1(b). The "Business" of BrightView is defined as "providing landscape and snow and ice removal services to Customers throughout the United States and abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal." *Id.* at § 1(a).

48. The Agreement defines the "Look Back Period" as "the two (2) year period preceding the voluntary or involuntary termination of team member's employment with BrightView for any reason." *See* Agreement at § 1(d).

49. The Agreement defines the "Restricted Territory" as "the geographic territory in which team member worked, represented BrightView, or had Material Business Contact with BrightView's Customers in the Look Back Period." *See* Agreement at § 1(g). "Material Business Contact" means "contact that is intended to establish or strengthen a business or professional relationship for BrightView, regardless of whether the contact is with a Customer directly assigned to team member or a Customer with which team member otherwise has contact in furtherance of the team member's job duties." *Id.* at § 1(f).

50. In Section 6 of the Agreement, Iatzko promised that he would not solicit BrightView's "Customers":

> **<u>Non-Solicitation of Customers</u>.** Team member agrees that during team member's employment for a period of two (2) years following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, either on behalf of team member or for any Competing Business, directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer or accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

*See* Agreement at § 6.

51. The Agreement defines "Customer" as "those individuals, companies, or other entities for whom BrightView has provided or does provide products or services in connection with the Business of BrightView or to whom BrightView has provided written proposal concerning the Business of BrightView and as to which team member has had Material Business Contact or received Confidential Information [during the Look Back Period]." *See* Agreement at § 1(d).

52. In the Agreement, Iatzko agreed that his restrictive covenants were reasonably designed to protect BrightView's legitimate interests in protecting its goodwill and Confidential

Information, and further, that any breach of the restrictive covenants would cause BrightView serious and irreparable injuries for which injunctive relief is the appropriate remedy:

> **Relief, Remedies, and Enforcement.** The parties acknowledge that BrightView is engaged in a highly competitive business and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect BrightView's legitimate business interests, including Company goodwill and Customer and other business relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by team member . . . during their employment. Team member acknowledges and agrees that a breach of any provision of this Agreement by the team member will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone. Thus, in the event of a breach or threatened breach of this Agreement by team member, BrightView shall be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened breach, despite any agreement between the two parties to arbitrate any disputes related to any aspect of team member's employment.

*See* Agreement at § 13.

**D. Iatzko's Breaches of Duty to BrightView.**

53. Iatzko voluntarily terminated his employment with BrightView on January 13, 2025. *See* Iatzko Affidavit at ¶ 8.

54. During his exit interview, Iatzko informed BrightView that he had accepted a position with Continuum as a business developer.

55. Iatzko further informed BrightView that his new duties would include finding new work for landscape maintenance services for Continuum.

56. Continuum is a property management company that "offers all-in-one facility and exterior services." *See* https://www.continuumservices.com/services/.

57. Among the services that Continuum provides are landscaping; grounds care and maintenance; landscape construction, design, and installation; tree care; water management, irrigation, and drainage; lawn maintenance; and snow removal. *See* https://www.continuumservices.com/service/landscaping-snow-removal/. Continuum provides such services within the geography encompassed by all points in Michigan south of I-69 and east of US 127 as well as in the metro-Toledo area (“Restricted Territory”).

58. Continuum is a competitor of BrightView.

59. Continuum is a Competing Business as defined by the Agreement.

60. Given that Iatzko had accepted a job with a Competing Business in order to provide the same or substantially similar services as those that he performed for BrightView, letters were sent to both Iatzko and Continuum on February 4, 2025 to demand certain information and assurances relating to compliance with Iatzko’s restrictive covenants. A true and correct copy of the letter from Paul J. Greco to Mike Iatzko dated February 4, 2025 is attached hereto as Exhibit C (“Iatzko Demand Letter”), and a true and correct copy of the letter from Paul J. Greco to Ted Spicer dated February 4, 2025 is attached hereto as Exhibit D (“Continuum Demand Letter”).

61. Iatzko and Continuum responded to the letters through counsel on February 11, 2025. *See* Letter from Jeffrey Izzard to Paul J. Greco dated February 11, 2025 (a true and correct copy of which is attached hereto as Exhibit E) (“Iatzko Response”). In the response, their counsel stated that “Continuum purposefully assigned Mr. Iatzko to a territory in metro Detroit,” apparently believing incorrectly that “metro Detroit” did not fall within the geographic scope of the Restricted Territory set forth in Iatzko’s non-competition restraint. *See* Iatzko Response at 1.

62. Since “metro Detroit” falls squarely within Iatzko’s Restricted Territory, BrightView followed up with Iatzko and Continuum the next day. On February 12, 2025,

BrightView's counsel (a) informed counsel for Iatzko and Continuum that Iatzko's Restricted Territory included the metro Detroit area and (b) reminded counsel that Iatzko and Continuum had failed to provide certain details regarding Iatzko's job with Continuum as requested. *See* Email Trail between Paul J. Greco and Jeffrey Izzard at email dated February 12, 2025 4:37 pm (a true and correct copy of the email trail, excluding attachments, is attached hereto as Exhibit F) ("Email Trail"). In light of these concerns, BrightView demanded a response by February 14, 2025.

63. Iatzko and Continuum provided a non-substantive response on February 14, 2025 that stated merely that they would "respond early next week." *See* Email Trail at email dated February 14, 2025 9:52 am.

64. When Iatzko and Continuum did not respond early during the following week as promised, BrightView's counsel wrote again on Tuesday, February 18, 2025 to request an update. *See* Email Trail at email dated February 18, 2025 10:48 am. Iatzko and Continuum did not respond to this message at all.

65. Having received no response to BrightView's follow-up demands, BrightView's counsel called and spoke with counsel for Iatzko and Continuum on Thursday, February 20, 2025. During that conversation, counsel for Iatzko and Continuum promised to provide a substantive response to address BrightView's concerns by the following day, or by Friday, February 21, 2025.

66. When Iatzko and Continuum did not respond on Friday, February 21, 2025 as promised, BrightView's counsel wrote again to counsel for Iatzko and Continuum on Monday, February 24, 2025 to demand a response by the close of business that day. *See* Email Trail at email dated February 24, 2025 12:15 pm.

67. Once again, counsel for Iatzko and Continuum did not respond substantively, but replied merely to state that the substantive response would be sent the following day. *See* Email

Trail at February 24, 2025 4:39 pm. BrightView's counsel immediately objected to yet another broken promise to respond by a date certain and to the continued failure by Iatzko and Continuum to address BrightView's concerns. *See id.* at email dated February 24, 2025 at 5:10 pm.

68. Iatzko and Continuum did not respond substantively to BrightView's demands for assurances regarding how they planned to comply with Iatzko's restrictive covenants until February 26, 2025. In that response, their counsel asserted that "Mr. Iatzko's territory at Continuum specifically includes Southfield, Troy, Birmingham, Warren, Auburn Hills, Grosse Pointe, and certain parts of the City of Detroit." *See* Email Trail at email dated February 26, 2025 at 5:19 pm.

69. Once again, a review of a map plainly shows that the towns to which Continuum has assigned Iatzko falls squarely within his Restricted Territory:

I-69 to the North ▲




◀ US 127 to the West

70. Iatzko has breached the Agreement by, among other things, becoming employed with Continuum in a Restricted Territory in a manner that requires him to provide the same or substantially similar services for Continuum that he provided for BrightView during the last two years of his employment at BrightView and that will result in the use or disclosure of BrightView's Confidential Information.

71. Unless enjoined, Iatzko will continue to breach obligations owed to BrightView under the terms of the Agreement.

72. BrightView has sustained, and will continue to sustain, serious and substantial injuries for which there is no adequate remedy at law.

**Count I**
**Breach of Contract**

73. BrightView incorporates by reference the allegations of Paragraphs 1 through 72 as if fully set forth herein.

74. BrightView and Iatzko are parties to the Agreement, the Agreement is supported by consideration, and the restrictive covenants set forth therein are ancillary to the Agreement.

75. Iatzko voluntarily resigned from BrightView on January 13, 2025.

76. Iatzko is currently employed by Continuum.

77. Continuum is a Competing Business under the Agreement.

78. Iatzko is working for Continuum as a business developer.

79. Iatzko's duties as a business developer for Continuum include finding customers to purchase Continuum's landscape maintenance and snow and ice removal services.

80. Iatzko is providing services for Continuum that are the same as or substantially similar to those that he provided for BrightView.

81. Upon information and belief, the services that Iatzko is providing for Continuum is resulting, or will result in, the use or disclosure of BrightView's Confidential Information.

82. Upon information and belief, Iatzko has directly or Indirectly (as defined by the Agreement) (a) solicited, diverted, or appropriated, (b) attempted to solicit, divert, or appropriate, or (c) threatens to solicit, divert, or appropriate one or more Customers with whom Iatzko had Material Business Contact during the last two years of his employment with BrightView.

83. Iatzko has been assigned to work and is continuing to work for Continuum in a geography that includes the Michigan towns of Southfield, Troy, Birmingham, Warren, Auburn Hills, Grosse Pointe, and certain parts of the City of Detroit.

84. The area to which Iatzko has been assigned to work and is continuing to work for Continuum falls within the geographic scope of the Restricted Territory under the Agreement.

85. By virtue of the foregoing actions, Iatzko has breached, and continues to threaten to breach, the non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement.

86. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are reasonable in duration, geographic, and substantive scope.

87. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are no greater than necessary to protect legitimate interests of BrightView, including, but not limited to, its interests in protecting its goodwill and its Confidential Information.

88. As a result of the foregoing breaches of the Agreement, BrightView has sustained, and will continue to sustain, damages.

89. Unless Iatzko is enjoined from the foregoing conduct, BrightView will be irreparably harmed by the loss of goodwill, the disclosure and use of its Confidential Information, the loss of the benefit of its investments, and present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

90. In the Agreement, Iatzko agreed that BrightView would be irreparably harmed by his breach or threatened breach of the Agreement and that, therefore, BrightView is entitled to injunctive relief and any other equitable relief allowed by law. *See* Agreement at § 13.

91. In the Agreement, Iatzko agreed that his knowledge, skills, and abilities are sufficient to permit him to earn a livelihood satisfactory to him without violating any provision set forth in Sections 3, 5, and 6 of the Agreement. *See* Agreement at § 13.

92. The balance of equities and public interest factors favor BrightView.

**Prayer for Relief**

WHEREFORE, BrightView demands judgment in its favor against Iatzko, together with the following relief:

A. an order granting preliminary and permanent injunctive relief to enjoin the use or disclosure of BrightView's Confidential Information as required by Section 3 of the Agreement;

B. an order granting preliminary and permanent injunctive relief to enjoin Iatzko, for one year, from engaging in conduct in breach of the non-competition covenant set forth in Section 5 of the Agreement, including, but not limited to, an order prohibiting Iatzko from providing the same or substantially similar services for a Competing Business in the Restricted Territory as those that Iatzko provided for BrightView;

C. an order granting preliminary and permanent injunctive relief to enjoin Iatzko, for two years, from engaging in conduct in breach of the non-solicitation covenant set forth in Section 6 of the Agreement;

D. an award of damages for such actual losses as may be proven at trial;

E. an award of attorneys' fees, costs, and interest as permitted by law; and/or

F. such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/ Paul J. Greco*
Paul J. Greco, Esquire
Sara Myirski, Esquire
FISHER & PHILLIPS LLP
Two Logan Square
100 N. 18th Street – 12th Floor
Philadelphia, PA 19103
Tel. (610) 230-2146/2178
Fax (610) 230-2151
Email pgreco@fisherphillips.com
smyirski@fisherphillips.com

Dated: April 21, 2025

*Counsel for Plaintiff BrightView Landscapes, LLC*

**VERIFICATION**

I, Sam Ventimiglia, verify that I am the Vice President and General Manager of BrightView Landscapes, LLC and that I am authorized to execute this Verification on its behalf. I have read the Verified Complaint and the facts and information set forth therein are true and correct to the best of my knowledge, information, and belief.

This Verification is made subject to 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: 04/14/2025

Sam Ventimiglia
Sam Ventimiglia (Apr 14, 2025 16:14 EDT)
Sam Ventimiglia, Vice President and
General Manager
BrightView Landscapes, LLC